T.C. Memo. 2008-265

UNITED STATES TAX COURT

DAVID W. AND CONNIE L. SWANSON, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

FSH SERVICES, R. RICHARD EVANS, TRUSTEE, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos. 550-00, 551-00.          Filed December 1, 2008.

<u>Joe Alfred Izen, Jr.</u>, for petitioners.

<u>Erin K. Salel</u> and <u>Jolene Itakura</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

COHEN, <u>Judge</u>:  In these consolidated cases, respondent
determined the following deficiencies, additions to tax, and
penalties with respect to petitioners' Federal income taxes:

David W. and Connie L. Swanson (Docket No. 550-00)

| Year | Deficiency | Addition to Tax Sec. 6651(a)(1) | Penalty Sec. 6662(a) |
|------|-----------|-------------------------------|---------------------|
| 1993 | $144,841 | -- | $28,968 |
| 1994 | 278,548 | -- | 55,710 |
| 1995 | 414,030 | $41,403 | 82,963 |

FSH Services, R. Richard Evans, Trustee (Docket No. 551-00)

| Year | Deficiency | Addition to Tax Sec. 6651(a)(1) | Penalty Sec. 6662(a) |
|------|-----------|-------------------------------|---------------------|
| 1993 | $186,002 | $46,501 | -- |
| 1994 | 311,953 | 77,988 | -- |
| 1995 | 434,977 | -- | $86,995 |

Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice of Procedure.

Respondent concedes that if FSH Services is disregarded for Federal tax purposes, it should not be subject to deficiencies, additions to tax, or penalties. After trial, respondent submitted the following revised computations of the amounts at issue, attributing the income in issue to David W. and Connie L. Swanson (collectively, the Swansons) and taking into account respondent's concessions as to deductions:

| Year | Deficiency | Addition to Tax Sec. 6651(a)(1) | Penalty Sec. 6662(a) |
|------|-----------|-------------------------------|---------------------|
| 1993 | $17,068 | -- | $3,413.60 |
| 1994 | 95,913 | -- | 19,182.60 |
| 1995 | 191,486 | -0- | 38,297.20 |

After concessions, the issues for decision are: (1) Whether the burden of proof has shifted to respondent under section 7491; (2) whether FSH Services is disregarded for Federal tax purposes and its income for the years in issue is attributed to the Swansons; (3) whether the periods of limitations on assessment expired before the deficiency notices were sent; (4) whether the Swansons are liable for self-employment tax on income from FSH Services; (5) whether the Swansons are entitled to deductions in excess of those allowed by respondent; (6) whether the Swansons are liable for the accuracy-related penalty under section 6662(a); and (7) whether the Swansons are liable for a penalty under section 6673.

The terms "trust", "trustee", "settlor", and other related terms are used in this opinion for convenience and are not intended to be conclusive as to the characterization of FSH Services for Federal tax purposes.

FINDINGS OF FACT

Some of the facts have been stipulated, and the stipulated facts are incorporated in our findings by this reference. The Swansons resided in California and FSH Services had a mailing address in California at the time their petitions were filed.

David W. Swanson (Mr. Swanson) and Connie L. Swanson (Mrs. Swanson) are married and have five children. The Swansons are well educated, each having a bachelor of science degree in

mechanical engineering from California Polytechnic State University, San Luis Obispo. From 1983 to 1991, Mr. Swanson worked for Hewlett-Packard Co. (Hewlett-Packard), first as an engineer and then as an engineer manager. Wanting to start his own engineering consulting business (the business), Mr. Swanson began investigating which form of business entity would best suit his needs.

In the summer of 1991, Mr. Swanson met with R. Richard Evans (Evans) to discuss the possibility of running the Swansons' forthcoming business through an "unincorporated organization in trust form". The Swansons decided to establish their business in this trust form, and on August 8, 1991, Cache Properties Unlimited (Cache), as named settlor, created FSH Services for this purpose.

One hundred shares called "capital units" represented the beneficial interest in FSH Services and were memorialized on a document called the trust certificate. In exchange for all 100 capital units, Cache purportedly transferred a corpus to the board of trustees, which at that time consisted only of Marcia Doerr (Doerr). According to the trust instrument, referred to as the Declaration of Trust and Indenture (indenture), FSH Service's corpus consisted of:

### Personal Property

```
Received    $100
Received    $200
Paid Out    $200
```

The record is not clear as to many details of the transaction, including who received the $200 "paid out". It appears that Cache contributed the $100 "received", and Doerr transferred all 100 capital units to Cache at this time. The Swansons contributed the $200 "received", also in exchange for the 100 capital units, even though the trust certificate designated all 100 capital units to Cache. No other money or property was put into the trust at its creation.

Shortly thereafter, the Swansons further funded the trust with approximately $3,400 to "get it going". On October 9, 1991, Doerr transferred 97 capital units to the Swansons and 3 capital units to three of the Swansons' children from the 100 capital units held by Cache. There is no record that Cache received remuneration for transferring its capital units.

Also on October 9, 1991, Doerr appointed the officers of FSH Services, as follows: Mr. Swanson, general manager; Mrs. Swanson, treasurer; Vernon Tritchka (Tritchka), assistant manager and secretary; and Gary McLeod (McLeod), protector. The indenture provided that no officer could be removed "without thirty days written notice given prior to such removal". The indenture also provided that McLeod, as protector, is the

"internal guardian of the fiduciary obligation of the Trustees toward the Capital Unit Holder(s)" and that he has the power to access all the records of the trust.

At the same time, Doerr appointed Evans cotrustee of FSH Services, and he served in that capacity for the years in issue. While still serving as treasurer, Mrs. Swanson replaced Tritchka as assistant manager on September 30, 1992.  On February 20, 1994, Evans replaced Doerr as executive trustee, and he appointed Susan O'Brien (O'Brien) cotrustee.  With respect to appointment of trustees, the indenture provided the following:

> Should there remain no Board to appoint a Successor Trustee, the Protector shall appoint one Trustee, or else the Capital Unit Holders may apply to a court of competent jurisdiction to appoint one Trustee; who shall then have power to appoint other Trustees.

The indenture and additional trust provisions contained within the minutes granted all the officers and trustees authority to manage operations of the trust and have signature authority of its bank accounts.  The indenture also provided that full health coverage and educational expenses of the officers and certificate holders could be paid for by the trust.

The business initially operated out of a converted bedroom at the Swansons' residence.  In 1993, the Swansons built a freestanding workshop on their property that FSH Services used for the business and Mr. Swanson used for his own commercial enterprise.  FSH Services paid rent for its use of the residence

and workshop and also paid one-quarter of the Swansons' utility bills.

FSH Services treated the Swansons as independent contractors and not as its employees.  Personal expenses of the Swansons were nonetheless paid by FHS Services, including family meals, medical and dental expenses, braces for at least one child's teeth, and their children's school tuition.  These personal expenses were claimed as deductible expenses of FSH Services.

Mrs. Swanson did the bookkeeping and kept the records for FSH Services.  For the years in issue FSH Services had six bank accounts, including an "income" account and an "operations" account, and all the accounts used the Swansons' home address as their mailing address.  Mrs. Swanson earned $100 a year in her capacity as bookkeeper, treasurer, and assistant manager of FSH Services.

Mr. Swanson quit his job with Hewlett-Packard in early 1992 to concentrate on the business full time.  As the general manager of FSH Services, Mr. Swanson found customers, made proposals, and reviewed contracts.  He also found and hired other engineers for FSH Services, whom he managed and assigned work.  On many contracts he worked as an engineer as well.  Mr. Swanson's reputation as an engineer/manager and his expertise, contacts, and goodwill attracted the clients of FSH Services.  For the years in issue, Mr. Swanson secured contracts with large

companies such as Hewlett-Packard, Gradco USA, Inc., and Proxima Corp. Mr. Swanson earned $500 a year in his capacity as general manager of FSH Services.

During the years in issue, Mr. Swanson also worked outside of FSH Services in his personal engineering business. Mr. Swanson decided which engineering jobs he worked through FSH Services and which jobs he personally performed. In the same workshop shared by FSH Services, Mr. Swanson invented products that he patented to himself. He received substantial licensing fees through his patents during this time.

After the business was up and running, Evans purportedly introduced Mr. Swanson to an Englishman named Bernard Putz (Putz). Putz claimed to represent an offshore trust in Gibraltar called the Loire Trust; he allegedly offered to capitalize FSH Services up to $200,000 if the Swansons would transfer their capital units to the Loire Trust. On November 16, 1992, the Swansons transferred one of their capital units to another of their children (for a total of 4 capital units in their children's names) and their remaining 96 units to the Loire Trust in exchange for an oral promise from Putz of a loan. The loan never occurred, and the Swansons never attempted to get their 96 units back from Putz or the Loire Trust.

The O'Brien Group, a tax services business owned and operated by O'Brien, prepared FSH Services' tax returns for the

years in issue. FSH Services was listed as a simple trust on its Forms 1041, U.S. Income Tax Return for Estates and Trusts, for 1992, 1993, and 1995, and the "Type of entity" box was left unchecked for 1994. As of June 1997, Internal Revenue Service (IRS) records did not show these tax returns as having been filed by FSH Services.

Schedules K-1, Beneficiary's Share of Income, Deductions, Credits, etc., attached to the tax returns showed FSH Services as having made beneficiary income distributions to the Loire Trust as follows: $51,789 in 1993; $225,813 in 1994; and $369,221 in 1995. However, there is no record that FSH Services ever made any distributions to the Loire Trust. FSH Services reported no other beneficial distributions, and the Swansons waived their children's rights to trust income for the years in issue.

On their Forms 1040, U.S. Individual Income Tax Return, the Swansons reported the following:

| Year | Gross Income | Taxable Income | Total Tax |
|------|--------------|----------------|-----------|
| 1993 | $87,471 | $59,330 | $20,917 |
| 1994 | 86,393 | 57,014 | 20,666 |
| 1995 | 94,258 | 61,364 | 21,178 |

The Swansons wrote the phrase "coactus feici" (sic) in the jurat box of their tax returns for the years in issue. The O'Brien Group prepared the Swansons' 1995 tax return.

The IRS audited petitioners' returns for the years in issue. The IRS recomputed FSH Services' gross receipts using a bank

deposit analysis. The IRS determined that FSH Services' net taxable deposits were $415,365.83 for 1993, $726,956.22 for 1994, and $983,721.96 for 1995. After concessions, these amounts were reduced to $53,359.44, $256,049.54, and $481,466.84 for 1993, 1994, and 1995, respectively. For reasons set forth below, and in relation to petitioners' statute of limitations argument, these reduced amounts represent amounts properly includable on but omitted from the Swansons' returns.

Revenue Agent Higgins (Higgins) conducted audit interviews with Mr. Swanson and his agent, O'Brien. When asked questions regarding FSH Services, Mr. Swanson refused to explain the Swansons' close connections with the trust other than his position as general manager. In a followup interview, Mr. Swanson and O'Brien refused to talk with Higgins and demanded that he be replaced on the grounds that Mr. Swanson had filed a lawsuit against him. Revenue Agent Lee (Lee) replaced Higgins and conducted a third interview. Mr. Swanson and O'Brien refused to answer many of Lee's questions, and they made insulting comments to and about Lee.

Higgins also conducted an interview with Evans (accompanied by O'Brien as his agent) regarding FSH Services. Evans refused to answer many questions at the interview, asserting his Fifth Amendment right against self-incrimination.

The IRS sent a notice of deficiency to the Swansons on October 12, 1999. Deficiencies were determined for the years in issue on conclusions that: 1) The Swansons improperly assigned their income to FSH Services; or, alternatively, 2) FSH Services is a sham trust with no economic substance and is disregarded for Federal tax purposes; or, alternatively, 3) FSH Services is determined to be a grantor trust under sections 671-677, and its income is taxable to the Swansons. The adjustments reflected in the notice included unreported gross receipts derived from the bank deposit analyses and disallowance of itemized deductions.

By a separate notice of deficiency sent to FSH Services, the IRS determined deficiencies for the years in issue primarily because of unreported gross receipts. Other adjustments for 1995 included modifications to expenses claimed on Schedule C, Profit or Loss From Business, and disallowance of the income distribution deduction.

After the years in issue, the Swansons discovered checks disappearing and unexplained amounts being withdrawn from the FSH Services' bank accounts. Evans refused to respond to questions regarding these matters. Mr. Swanson brought a copy machine to Evans's home and copied the FSH Services records that were stored there. Upon investigation, the Swansons found that Evans had written several checks that were unaccounted for in the bookkeeping. The Swansons objected to Evans's behavior and,

along with O'Brien, requested that Evans resign as trustee. Because Evans did not agree to resign, they demanded that he surrender FSH Services' checkbooks, which he did.  The Swansons later transferred the business out of FSH Services and into a new entity, Maxim Automation Products, L.L.C. (Maxim), which acquired all subsequent contracts.  FSH Services provided capital for the new venture and became a partner in Maxim.

On October 5, 2006, the U.S. District Court for the Southern District of California found O'Brien guilty of 1 count of conspiracy to defraud the United States, 6 counts of tax evasion, 6 counts of tax evasion--aiding and abetting, and 28 counts of aiding and assisting the filing of false income tax returns.  The court sentenced her to over 10 years in prison.

On October 6, 2006, the District Court found Evans guilty of 1 count of conspiracy to defraud the United States, 6 counts of tax evasion--aiding and abetting, and 12 counts of aiding and assisting the filing of false income tax returns.  The court sentenced him to over 6 years in prison.  Joe Alfred Izen, Jr. (Izen), petitioners' counsel in these cases, represented Evans in his trial.  Petitioners were aware of and consented to Izen's representation of Evans in spite of potential conflicts of interest between petitioners and Evans.

Because of these criminal convictions, Evans and O'Brien no longer served as trustees. The Swansons chose a friend, Mark Corcoran (Corcoran), as the new trustee of FSH Services.

OPINION

Petitioners argue that FSH Services is a valid entity independent of the Swansons and that all transactions involving FSH Services should be respected for Federal tax purposes. Respondent argues that the Swansons should be taxed on income of FSH Services and adduces three alternative theories as to why: 1) FSH Services is a sham trust that has no economic substance; 2) the assignment of income doctrine applies; or 3) the grantor trust provisions apply. We agree with respondent on the first theory.

Burden of Proof

Petitioners bear the burden of proof in these cases, and it has not shifted under section 7491(a). See Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933). Petitioners did not cooperate during IRS examinations but obstructed them by refusing to produce certain documents or to answer questions. See sec. 7491(a)(2)(B). Petitioners were confrontational and insulting to the revenue agents.

Moreover, even though their testimony and exhibits are voluminous, petitioners did not present credible evidence that FSH Services had economic substance. See sec. 7491(a)(1). The

evidence that they did produce was undermined by their implausible claims. Their testimony about events and their explanations of improper deductions were not credible. (For example, Mrs. Swanson, during her testimony, attempted to justify the FSH Services deduction of the costs of family meals and a trip by petitioners to Hawaii as "management expenses".) We are not required to accept testimony that is improbable or vague. See Geiger v. Commissioner, 440 F.2d 688, 689-690 (9th Cir. 1971), affg. T.C. Memo. 1969-159; Sanderlin v. Commissioner, T.C. Memo. 2008-209.

The Swansons' testimony was improbable. They claim that the trust they established, with the effect of their reporting minimal tax liability on substantial profits of the business, was not tax motivated. Petitioners contend that they created their business within the trust for "asset protection" purposes. Yet the Swansons, according to their testimony, inexplicably gave away their 96 capital units of FSH Services for nothing more than a stranger's promise of a loan. Petitioners present no evidence of this transaction or of the unknown, off-shore Loire Trust. It is not plausible or credible that the Swansons, gravely concerned about protecting assets, would have given away their legal and beneficial interests in the business that was their livelihood.

The Swansons closely interacted with Evans and O'Brien but deny that they ever discussed tax avoidance. Evans, however, has

long been involved with the abusive trusts, and both he and
O'Brien promoted tax evasion schemes to their clients.  See
Buckmaster v. Commissioner, T.C. Memo. 1997-236; see also United
States v. Evans, No. 03CR1110-L (S.D. Cal. Oct. 6, 2006) (finding
Evans guilty of tax evasion aiding and abetting, among other
crimes); United States v. O'Brien, No. 03CR1110-L (S.D. Cal. Oct.
5, 2006) (finding O'Brien guilty of tax evasion aiding and
abetting, among other crimes), affd. sub nom. United States v.
Cook, 261 Fed. Appx. 52 (9th Cir. 2007).  We do not believe that
Evans did not promote tax avoidance as a primary objective when
proposing his trust schemes to the Swansons.

The Swansons also directly demonstrated tax-protester
actions, including writing "coactus feici" in the jurat boxes of
their tax returns for the years in issue.  Mrs. Swanson
understood that coactus feci meant "something like [signing the
return] but under protest, or not protest but reserving my rights
kind of thing".  Mr. Swanson's hostile actions against the
examining agents were consistent with protester attitudes.  Their
associates playing roles in these cases maintained similar
positions in other cases.  See Corcoran v. Commissioner, T.C.
Memo. 2002-18 (Corcoran, a trained accountant, brought standard
tax-protester arguments before the Court, which imposed a section
6673(a) penalty for his insistence in pursuing frivolous
contentions), affd. 54 Fed. Appx. 254 (9th Cir. 2002); Caralan

<u>Trust v. Commissioner</u>, T.C. Memo. 2001-241 (Doerr was the trustee of trusts used by taxpayers to avoid tax and shift income and, as a result, the Court determined a penalty of $12,500 was warranted for frivolous claims and positions). Given their antitax position, implausible claims, and dearth of credible evidence, we do not accept petitioners' assertion that they established the trust for nontax business reasons. They have not satisfied the prerequisite to shifting the burden of proof under section 7491(a)(2).

<u>Disregard of FSH Services</u>

Tax motivation alone is not a ground to disregard FSH Services for Federal tax purposes. A taxpayer has the right to elect a business form to minimize or altogether avoid the incidence of taxation by any means that the law permits. See <u>Gregory v. Helvering</u>, 293 U.S. 465, 469 (1935). This right, however, does not grant the taxpayer leeway to structure a paper entity to avoid tax when that entity is without economic substance. <u>Zmuda v. Commissioner</u>, 79 T.C. 714, 719 (1982), affd. 731 F.2d 1417 (9th Cir. 1984). Nor is the Government required to simply accept a taxpayer's election of business form where that form is a sham. <u>Higgins v. Smith</u>, 308 U.S. 473, 477 (1940). Instead, the Government should disregard the sham, as any other result would allow the schemes of the taxpayer to supersede the law. <u>Id.</u>

Application of these principles requires us to look beneath the surface of a purported trust and examine its economic reality. See Profl. Servs. v. Commissioner, 79 T.C. 888, 924 (1982). If a trust has no economic substance apart from tax considerations, the trust is not recognized for Federal tax purposes. Markosian v. Commissioner, 73 T.C. 1235, 1244-1245 (1980). We consider the following factors to determine whether FSH Services lacks economic substance: (1) Whether the Swansons' relationship as settlors to the property differed materially before and after the trust's creation; (2) whether the trust had trustees who could act independently of the Swansons; (3) whether any economic interest passed to other trust beneficiaries; and (4) whether the Swansons respected the restrictions placed on the operation of FSH Services as set forth by the indenture or the law of trusts. Id. at 1243-1244; accord Sparkman v. Commissioner, 509 F.3d 1149, 1155 (9th Cir. 2007), affg. T.C. Memo. 2005-136.

With respect to the first factor, we look beyond the named settlor to the economic reality of the purported trust in order to determine the true settlor. See Zmuda v. Commissioner, supra at 720. Cache, the named settlor, appeared out of nowhere and transferred $100 to create FSH Services. Once it had served this purpose, Cache conveniently disappeared from the record. This exact scenario occurred in another case involving Evans where we

determined Cache to be a "straw man". Buckmaster v. Commissioner, supra. Here, too, Cache was a nominal settlor.

Petitioners contend that the Swansons never transferred any property to FSH Services and therefore cannot be its settlors. The economic reality of the creation of FSH Services, however, is that only the Swansons funded the trust in any meaningful way, first with an initial $200, then more funds amounting to $3,400. These amounts, along with the use of the Swansons' residence, are the only physical assets that started FSH Services and the business within. Petitioners state that FSH Services "started with nothing", but they ignore these assets with which the Swansons initially funded FSH Services.

Petitioners also disregard the intangible assets that the Swansons supplied to FSH Services. The trust had no potential value without the services of the Swansons, especially Mr. Swanson's skills and resources. The combination of $3,600 in capital and the Swansons' talents was the principal asset and income producer for FSH Services. As the only persons to put anything of value into the trust, the Swansons are the true settlors of FSH Services.

We now look to whether the Swansons' relationship to trust property differed materially before and after creation of FSH Services. Petitioners argue that the business was formed within, and not transferred to, the trust. Thus, they claim, the

Swansons could not have had a relationship with the business before the trust because the business did not exist at that point.  The business of FSH Services, however, was nothing more than Mr. Swanson's array of income-producing skills.  These service skills cannot be transferred solely to the trust, and they remain as inherent to Mr. Swanson after the creation of the trust as they were before.  Moreover, the Swansons' access to their residence, their tools, and their initial funds did not materially change because of the trust.  The line between trust property and personal property was often blurred as the Swansons used trust funds to pay for clearly personal expenses of themselves and their children.  The Swansons' relationship to the property did not differ in any material aspect before and after the creation of the trust.

The second factor is whether FSH Services had trustees who could act independently of the Swansons.  This factor would include the power to prevent the Swansons from acting against the interests of the beneficiaries.  See Markosian v. Commissioner, supra at 1244.  The failure of a trustee to have any meaningful role in the operation of the trust has been repeatedly cited by this Court as evidence that the entity lacks economic substance.  See Zmuda v. Commissioner, supra at 720-721; Para Techs. Trust v. Commissioner, T.C. Memo. 1994-366, affd. without published opinion sub nom. Anderson v. Commissioner, 106 F.3d 406 (9th Cir.

1997).  Petitioners interpret this factor as satisfied because the trustees, especially Evans, were actively involved in the business.  Petitioners argue that Evans signed multiple business letters and minutes of FSH Services.  The name on the documents, however, is not persuasive evidence of Evans's independent control.

Evans paid what he was told by the Swansons to pay and signed what he was told to sign.  Mr. Swanson, not Evans, decided what contracts would be accepted and which ones he would perform as an individual and which would be attributed to FSH Services. When the Swansons disagreed with Evans's use of an FSH Services bank account, apparently to his own benefit and not that of the trust, they forced Evans to surrender the trust's checkbook.  The Swansons transferred the main asset of FSH Services, the business, to Maxim along with all new engineering contracts and the accompanying income.  No trustee had the power to prevent this from happening, and FSH Services funded the Swansons' new business.  The Swansons could not be removed from their positions as management officers without prior notice, while the trustees were not entitled to such notice.  The evidence establishes that the Swansons held perpetual control of FSH Services and that FSH Services lacked independent trustees.  See United States v. Scott, 37 F.3d 1564, 1571 (10th Cir. 1994).

As to the third factor, petitioners failed to prove that an economic interest ever passed to any beneficiary of FSH Services. For the years in issue, the purported beneficiaries were the Loire Trust (96 units) and the Swanson children (4 units). FSH Services, as a simple trust, was required to distribute all of its current income for the taxable year to the beneficiaries. See sec. 1.651(a)-1, Income Tax Regs. FSH Services' Forms 1041 and Schedules K for the years in issue reflect substantial income distributions to the Loire Trust. However, none of these distributions can be substantiated from the evidence. To the contrary, the income of FSH Services remained under the control of petitioners. There is no persuasive corroboration that the Loire Trust exists as an entity.

With respect to the children, the Swansons provided letters to Evans that waived their children's beneficial distributions for the years in issue. While the children did receive benefits paid from the trust such as school tuition, medical insurance, braces, and other personal expenses, they did not receive them in their capacity as beneficiaries of FSH Services. The payments for the benefit of the children were disguised as deductible expenses of the trust. Mrs. Swanson admitted during her testimony that FSH Services paid <u>and</u> <u>deducted</u> as expenses tuition for the children and all medical costs for the family.

Moreover, the trust certificate shows that Cache was initially assigned the 100 capital units of FSH Services. Two months later, Cache transferred its 100 units to the Swansons and their children. The Swansons transferred their units a little over a year later to the Loire Trust. These transfers took place with no evidence that the previous "beneficiaries" ever received any consideration for their capital units. This paper shuffling further shows the lack of economic reality of these arrangements. See Sparkman v. Commissioner, T.C. Memo. 2005-136. We conclude that no economic interest passed to any of the alleged beneficiaries of FSH Services.

In considering the fourth factor, we look to whether the Swansons were bound by any restrictions imposed by the indenture of FSH Services or the law of trusts. The record shows that the Swansons disregarded the purported separateness of the trust. Several properties were used interchangeably between the Swansons and the trust including the Swansons' residence, the workshop, and tools. The Swansons had and used access to trust bank accounts and used trust income to pay their personal expenses.

The trust indenture states that a successor trustee can be appointed by another trustee, the protector, or a court through the request of the capital unit holders. The Swansons, who held none of those titles, disregarded the indenture and chose their friend Corcoran as successor trustee.

The Swansons allegedly pursued Evans over missing funds of FSH Services, supposedly on behalf of their children's 4-capital-unit interest and through a self-proclaimed fiduciary duty. The indenture grants the "protector" McLeod the fiduciary responsibility to proceed against the trustees on behalf of the beneficiaries. It also grants the protector the right to access trust records. Again, the Swansons ignored the trust instrument and acted as the owners of trust assets. The Swansons' actions were inconsistent with the restrictions set forth in the indenture or the laws of trust.

The four factors for testing the economic reality of FSH Services weigh heavily against petitioners. In accordance with Markosian v. Commissioner, 73 T.C. 1235 (1980), we conclude that FSH Services is a sham trust lacking economic substance for Federal tax purposes. Having found the trust structure of FSH Services to be a sham, we hold that the income in issue is taxable wholly to the Swansons. Because we reach this holding under a sham trust theory, we need not consider respondent's alternative arguments applying grantor trust provisions or the assignment of income doctrine.

Petitioners alternatively argue that if FSH Services is not recognized for Federal tax purposes, then Evans should be liable for the amounts at issue under a theory of attribution of income.

Petitioners contend that Evans, and not the Swansons, received, maintained, and enjoyed the income in issue.

A well-established principle of tax law is that income is taxed to the person who earns it. Lucas v. Earl, 281 U.S. 111, 114-115 (1930). This taxing of income cannot "be escaped by anticipatory arrangements and contracts however skil[l]fully devised to prevent the salary when paid from vesting even for a second in the man who earned it." Id. at 115. The determination of the proper taxpayer depends upon which person or entity in fact controls the earning of the income rather than who ultimately receives the income. See Vnuk v. Commissioner, 621 F.2d 1318, 1320 (8th Cir. 1980), affg. T.C. Memo. 1979-164.

The Swansons used their expertise, labor, goodwill, and money to start up and maintain the business that earned income through FSH Services for the years in issue. Mr. Swanson made all the business decisions free from demands or direction by anyone else. He decided who FSH Services would work with, how many jobs to take, how much to charge, and even which jobs would be done through the auspices of FSH Services and which jobs he would take on personally. He sought customers, hired and managed contractors, made proposals, and reviewed contracts. The Swansons controlled who received the money earned by their services, be it FSH Services, Maxim, or the Swansons themselves through Mr. Swanson's own work.

That the Swansons placed Evans in a figurehead position with signature authority over their accounts does not alter their control over the earnings of the income in issue anymore than does their giving away all their beneficial interests to the Loire Trust. That Evans, well after the years in issue, may have diverted funds does not alter the Swansons' control over the earnings of that income during the years in issue. The Swansons ultimately directed when, where, and with whom their earnings would be placed. Consequently, the Swansons, and not Evans, are liable for the amounts at issue as the income they earned through their services can be attributed only to them.

Period of Limitations

Without ever having pleaded the issue, petitioners, almost as an afterthought in their briefs, argue that the deficiencies are barred by the 3-year statute of limitations under section 6501. We need not consider an issue not properly raised. See Rule 39; Mecom v. Commissioner, 101 T.C. 374, 382 (1993), affd. without published opinion 40 F.3d 385 (5th Cir. 1994). The answer here, however, is clear: section 6501(e)(1)(A) provides that tax may be assessed within 6 years after a return is filed where, as here, a taxpayer omits from gross income "an amount properly includible therein which is in excess of 25 percent of the amount of gross income stated in the return". Because the

Swansons omitted income in the amounts set forth in our findings, section 6501(e) applies.

## Self-Employment Tax

Petitioners contend that the Swansons are not liable for self-employment taxes solely because the income in issue is not attributable to them.  Because we hold that the Swansons earned the income, they are liable for the self-employment tax imposed by section 1401 and entitled to the related deduction under section 164(f).

## Deductions

Petitioners argue that the Swansons are entitled to Schedule C deductions in excess of those allowed by respondent for the years in issue.  Taxpayers bear the burden of proving that they are entitled to any deductions claimed.  New Colonial Ice Co. v. Helvering, 292 U.S. 435 (1934); Rockwell v. Commissioner, 512 F.2d 882, 886 (9th Cir. 1975), affg. T.C. Memo. 1972-133. Taxpayers are required to maintain records that are sufficient to enable the IRS to determine their correct tax liability.  See sec. 6001; sec. 1.6001-1(a), Income Tax Regs.  Taxpayers must substantiate both the amount and the purpose of the claimed deductions.  Higbee v. Commissioner, 116 T.C. 438, 440 (2001). Taxpayers must also show that the IRS's determinations as to deductions are in error.  Rule 142(a); Welch v. Helvering, 290 U.S. at 115.

In their reply brief, petitioners specify items and amounts that they still claim are deductible. Petitioners, however, do not cite evidence that substantiates these deductions or shows any error in the IRS's determinations. For example, petitioners claim $2,773 should be allowed as a deduction for "FSH Services Continuing Education" in 1994. The first $2,320 of this "business expense" was for "Beneficiary Education", which apparently was the tuition payments for the private education of the Swansons' children. The remaining $453 was for "Officer Education", which apparently was a subscription to an undisclosed newsletter and law books. No effort is made to explain how this tuition reimbursement, an untitled newsletter, and tersely described "law books" relate to the ordinary and necessary expenses of the Swansons' business. See sec. 162(a). Moreover, the documents petitioners submitted, i.e., self-generated or generic receipts, scrawled notes, and a copy of the front of one check, are unreliable.

The record establishes only that petitioners are trying to claim personal expenses as business deductions. See sec. 262(a). It does not support any allowances not already conceded by respondent.

## Accuracy-Related Penalties

Respondent determined that the Swansons are liable for section 6662(a) accuracy-related penalties for all years in

issue.  Section 6662(a) imposes a 20-percent accuracy-related penalty on the portion of an underpayment of tax attributable to any one of various factors, including any substantial understatement of income tax.  See sec. 6662(b)(2).  A substantial understatement exists if the amount of the understatement exceeds the greater of 10 percent of the tax required to be shown on the return or $5,000.  Sec. 6662(d)(1)(A).

Under section 7491(c), the Commissioner bears the burden of production with regard to penalties and must come forward with sufficient evidence indicating that it is appropriate to impose penalties.  Higbee v. Commissioner, supra at 446.  However, once the Commissioner has met the burden of production, the burden of proof remains with the taxpayer, including the burden of proving that the penalties are inappropriate because of reasonable cause or substantial authority.  Id. at 446-447.  Respondent's burden of production is met by proof that the Swansons substantially understated their income tax because they failed to properly report the income they earned.

Section 6662(a) penalties are inapplicable to the extent the taxpayers had reasonable cause and acted in good faith.  Sec. 6664(c)(1).  Petitioners argue that they are not liable for this penalty because they did not understate their Federal income tax.  This is so, petitioners contend, because FSH Services was a

taxable entity separate from them and not a sham.  We have, however, already held that FSH Services was a sham.  Given the evidence presented, we conclude that petitioners neither had reasonable cause for their underpayments nor acted in good faith.  We sustain respondent's determination on this issue.

Section 6673

Section 6673(a)(1) prescribes a penalty not in excess of $25,000 when a taxpayer:  (1) Institutes or maintains a proceeding primarily for delay, (2) pursues a position in this Court that is frivolous or groundless, or (3) unreasonably fails to pursue available administrative remedies.  Petitioners contend that they brought these cases in good faith and were able drastically to reduce the determined deficiencies.

The Swansons' tax liabilities are reduced from the amounts determined in the notices of deficiency, but this aspect alone does not avoid a section 6673 penalty.  The reduction was not based on any evidence produced or arguments made by petitioners, and respondent's concessions would have probably occurred during the administrative process if petitioners had cooperated rather than obstructed the examination.  See sec. 6673(a)(1)(C); Suri v. Commissioner, T.C. Memo. 2004-71, affd. 96 AFTR 2d 2005-6526 (2d Cir. 2005); Caralan Trust v. Commissioner, T.C. Memo. 2001-241; Griest v. Commissioner, T.C. Memo. 1995-165; see also Ruocco v. Commissioner, T.C. Memo. 2002-91, affd. 346 F.3d 223 (1st Cir.

2003).  The arguments petitioners assert regarding the economic reality of their trust have been universally rejected by this and other courts.  See MatrixInfoSys Trust v. Commissioner, T.C. Memo. 2001-133, affd. sub nom. Hromiko v. Commissioner, 56 Fed. Appx. 359 (9th Cir. 2003).

Petitioners claim that the Court at the conclusion of the trial recognized the uniqueness of their trust, but the Court's statement was that no such trust ever succeeded in avoiding tax on earnings of a business and allowing individuals to deduct obviously personal expenses.  Petitioners were warned that their arguments lacked merit and had been the basis for sanctions in prior cases.  E.g., Sandvall v. Commissioner, T.C. Memo. 1989-189, affd. 898 F.2d 455 (5th Cir. 1990).  Petitioners continued to press forward with these cases.  They created a voluminous paper record, but it lacked substance and defied reality.  Their claims were implausible and groundless, and their cases are not distinguishable from scores of others.  Penalties had previously been imposed on their chosen associates and others in similar circumstances.  See Johnson v. Commissioner, 289 F.3d 452, 456-457 (7th Cir. 2002), affg. 116 T.C. 111 (2001); Corcoran v. Commissioner, T.C. Memo. 2002-18; Caralan Trust v. Commissioner, supra.  On the record in these cases, a penalty of $12,500 is appropriately imposed on the Swansons.

We have considered the other arguments of the parties, and they either are without merit or need not be addressed in view of our resolution of the issues.

To reflect the foregoing,

<u>Decision will be entered under Rule 155 in docket No. 550-00, and an appropriate order will be issued in docket No. 551-00</u>.