# United States Tax Court

T.C. Memo. 2023-96

LAWRENCE JAMES SACCATO,
Petitioner

v.

COMMISSIONER OF INTERNAL REVENUE,
Respondent

————

Docket No. 831-19.                          Filed July 25, 2023.

————

Lawrence James Saccato, pro se.

*Catherine J. Caballero*, *Kimberly A. Trujillo*, *Kimberly L. Clark*, and *Susan T. Mosley*, for respondent.


## MEMORANDUM FINDINGS OF FACT AND OPINION

LAUBER, *Judge*: Petitioner is a serial nonfiler. He failed to file Federal income tax returns for an uninterrupted period of at least 14 years, including 2013–2016, the years at issue in this case. For these years the Internal Revenue Service (IRS or respondent) determined deficiencies and additions to tax as follows:[1]

---

[1] Unless otherwise indicated, statutory references are to the Internal Revenue Code, Title 26 U.S.C., in effect at all relevant times, regulation references are to the *Code of Federal Regulations*, Title 26 (Treas. Reg.), in effect at all relevant times, and Rule references are to the Tax Court Rules of Practice and Procedure. We round all monetary amounts to the nearest dollar.

[*2]

| Year | Deficiency | Failure to File Addition to Tax § 6651(a)(1) | Failure to Pay Addition to Tax § 6651(a)(2) | Failure to Pay Estimated Tax Addition to Tax § 6654 |
|---|---|---|---|---|
| 2013 | $40,169 | $9,038 | $10,042 | $721 |
| 2014 | 113,886 | 25,624 | To be determined | 2,045 |
| 2015 | 24,419 | 5,494 | To be determined | 440 |
| 2016 | 22,242 | 5,004 | To be determined | 532 |

The deficiencies are attributable to unreported rental income, gain from the sale of real property, taxable Social Security benefits, and certain "other income." Petitioner conceded at trial that he is taxable on $3,142 of Social Security benefits for 2016, as determined in the notice of deficiency. Respondent conceded on brief that, for 2013, $44,360 of the "other income" determined in the notice of deficiency is not taxable to petitioner. We will rule for respondent as to all remaining issues. We will also require petitioner to pay under section 6673(a) a penalty of $10,000 to the United States for persistently advancing frivolous positions in this Court.

FINDINGS OF FACT

The following facts are drawn from the pleadings, the trial testimony, documents admitted into evidence at trial, and Stipulations of Facts with attached Exhibits admitted into evidence under Rule 91(f). Petitioner resided in Oregon when he timely petitioned this Court.

Petitioner has worked in the warehouse and ministorage business for many years. Beginning in the 1990s or earlier, he created a panoply of entities that purported to hold assets that he deployed in his business and financial transactions. He describes these entities as "trusts" and denies holding any beneficial stake in them. But he has produced no trust agreements, declarations of trust, tax returns, or other documents that would substantiate the legal existence of such entities or confirm the identities of their settlors, trustees, or beneficiaries. We find that these "trusts" do not exist and that, if they did exist, they would be shams. The sole purpose of these fictitious entities was to obscure petitioner's true ownership of the assets they purportedly held. At all times

[*3] petitioner exercised total control over these assets and the income they produced, using them for his personal enjoyment and benefit.

A.   *Hide Away Storage*

In the early 1990s petitioner and John Dillingham founded a storage business variously called Hide Away Storage and Hide Away Mini Warehouses (Hide Away). Hide Away's revenue came from the rental of storage sheds, U-Haul vehicles, space for the storage of cars and RVs, and land on which a cell tower stood. Petitioner and Mr. Dillingham operated Hide Away as a partnership. In 1991 they opened a checking account at South Umpqua State Bank (Umpqua account) in the name of "Hide Away Mini Warehouse." As of 2013 petitioner owned 100% of the ministorage business and the assets used to run it, having acquired Mr. Dillingham's share at some point before the latter's death in 2009.

The physical assets of the business were located at multiple addresses on Grant Smith Road in Roseburg, Douglas County, Oregon. Beginning in 2013 or earlier, Hide Away's principal office occupied one of three units at 265 Grant Smith Road. Other units in that building were occupied by Currieco Real Estate, Inc. (Currieco). Currieco's principal real estate broker and sole shareholder was Valynn Currie. Ms. Currie and petitioner have dated periodically since the early 2000s, gone on vacations together, and lived together since 2016.

During 2013–2016 most of Hide Away's business receipts were deposited into the Umpqua account. Petitioner was the only signatory on the Umpqua account during this period. He also deposited to this account numerous checks made payable to him personally.

During 2013–2016 petitioner withdrew more than $100,000 from the Umpqua account to pay his personal expenses. These included expenses charged to a Wells Fargo credit card account in the name of "Larry Saccato," a second Wells Fargo credit card account in the name of "L Saccato Investments," a charge account at the Douglas County Farmers Co-op, and a personal line of credit at WestAmerica Bank in the name of "Lawrence Saccato."

In August 2013 petitioner decided to offer Hide Away's customers the option to pay by credit card, in part to facilitate the rental of U-Haul vehicles. He enlisted Ms. Currie to help establish a credit card payment processing account on Hide Away's behalf. Ms. Currie used Currieco's employer identification number to set up this account.

**[\*4]**     On August 15, 2013, Ms. Currie executed an application for a payment processing account with CTS Holding, LLC (CTS).  On the application she stated that the applicant's name was "Currieco-U Haul Inc." doing business as "Hideaway Storage."  The credit card machine tied to the account was in Hide Away's office.

During 2013–2016 CTS processed more than $100,000 in credit card transactions for Hide Away, and the proceeds were deposited into another Umpqua checking account held in the name of "Currieco-U Haul."  Ms. Currie or her employee Trisha Bates intermittently drew checks on this account made out to Hide Away; the memo line on these checks indicated that they reflected the proceeds of CTS credit card transactions.  Petitioner deposited these checks into Hide Away's Umpqua account or into another account he controlled.

The annual amounts of CTS credit card proceeds were reported to the IRS on Forms 1099–K, Payment Card and Third Party Network Transactions.  Copies of these Forms 1099–K were issued to "Currieco-U Haul, Inc., Hideaway Storage."  But Ms. Currie did not consider the CTS credit card proceeds to belong to Currieco, and they were not reported on Currieco's tax returns for 2013–2016.

On April 26, 2016, Ms. Currie opened three deposit accounts at Rogue Credit Union (Rogue accounts) in the name of "Currieco Real Estate."  All monthly statements for these accounts were addressed to "Hideaway Storage."  Petitioner asked Ms. Currie to open the Rogue accounts as a replacement for Hide Away's Umpqua account, which was then being levied upon by the IRS to satisfy petitioner's 2012 Federal tax liabilities.

Ms. Currie (or her employee Ms. Bates) deposited more than $33,000 into the Rogue accounts in 2016.  But Ms. Currie did not consider the sums thus deposited to belong to Currieco.  None of these amounts was reported on Currieco's tax returns for 2013–2016.

Petitioner had access to the checkbooks for the Rogue accounts.  When he wished to extract cash from those accounts, he would complete the payee line on a check and insert the amount to be paid.  Ms. Currie or Ms. Bates would sign and date the check, then give it to petitioner.  Petitioner used funds from the Rogue accounts to pay his personal expenses, including $19,000 of purchases racked up on his two Wells Fargo credit cards.

[*5] B.    *Petitioner's Sham Entities*

In 1999 petitioner purported to contribute Hide Away's assets to a trust called Hideaway Holdings. Petitioner was supposedly the settlor of this trust, and Ms. Currie and Marcia Willardson served as its supposed managers and trustees. Ms. Willardson (formerly known as Marcia Doerr) has a history of involvement with sham trusts used by taxpayers to shift income and avoid tax. *See, e.g., Swanson v. Commissioner,* T.C. Memo. 2008-265, *aff'd,* 438 F. App'x 582 (9th Cir. 2011); *Caralan Trust v. Commissioner,* T.C. Memo. 2001-241; *United States v. Edwards*, No. 17-cv-1105, 2018 WL 2499386 (E.D. Cal. June 4, 2018).

Petitioner testified that he was not a trustee of Hideaway Holdings. But in 2002 he registered the name "Hideaway Holdings" with the Oregon secretary of state and represented that he was its trustee. And in 2004 he registered the name "Hideaway Holdings I" with the Oregon secretary of state and represented that he was its trustee. He is also listed as a trustee of Hideaway Holdings I on a notarized "Certification of Trustees Under Trust," which Ms. Currie signed in 2014.

Emerald Investment (Emerald) was the purported beneficiary of Hideaway Holdings. Ms. Currie and Ms. Willardson, the supposed trustees of Hideaway Holdings, allegedly also served as Emerald's trustees. Petitioner testified that he was not a trustee of Emerald, but he represented that he was its trustee on documents associated with a U.S. Bank checking account titled to Emerald. Petitioner was the only signatory on that U.S. Bank account during 2013–2016.

Emerald purported to manage Hide Away's storage business and collect rent payments from its customers. In fact, all of those activities were performed during 2013–2016 by petitioner or Ms. Currie. Ms. Currie testified that she prepared Forms 1099 reporting income from the storage business to Emerald. But no such Forms 1099 were produced at trial, and there is no evidence that they were ever prepared or filed with the IRS.

Petitioner, Ms. Currie, and Ms. Willardson all professed ignorance as to who Emerald's beneficiary was. We find as a fact that, if any of these trusts was genuine, petitioner was Emerald's beneficiary. Although he testified that he had no financial interest in Emerald's assets or income, we found his testimony (on this and many other points) lacking in credibility.

[*6]   During 2013–2016 petitioner was associated with several other purported trusts, known variously as Olive Branch, Olive Branch Equities, and/or Olive Branch Equities and Land (collectively, Olive Branch). Ms. Currie was allegedly a trustee of Olive Branch. Petitioner testified that he was not a trustee of Olive Branch, but in September 2014 he signed a "Certification of Trustees Under Trust" representing that he was its trustee. Petitioner, Ms. Currie, and Ms. Willardson all professed ignorance as to who Olive Branch's beneficiary was. We find as a fact that, if any of these trusts was genuine, petitioner was its beneficiary.

During 2013–2016 petitioner was the sole signatory on a U.S. Bank account in the name of Olive Branch. That account had been opened in 2009 by petitioner and Mr. Dillingham. During 2013–2016 petitioner deposited into this account rent checks he received from operators of a cell tower located at 275 Grant Smith Road in Roseburg. Most of these checks were made payable to "Olive Branch Equities, Lawrence J Saccato Trustee." Petitioner used funds from this account to pay personal expenses, including a 2015 vacation he took with Ms. Currie to Pueblo Bonito Sunset Beach in Mexico.

C.   *Real Estate Sale*

In 2002 petitioner acquired from Douglas County real property at 250 Grant Smith Road in Roseburg (250 Property). On June 4, 2002, a warranty deed was recorded transferring the 250 Property to "Lawrence James Saccato in his capacity as Trustee of Hideaway Holdings." This document does not indicate what consideration (if any) was paid for the 250 Property.

In 2014 Hideaway Holdings, the nominal owner of the 250 Property, transferred it to Currieco. Petitioner, as a purported trustee of Hideaway Holdings, executed and recorded a series of warranty deeds with respect to this transfer. Currieco paid no consideration to Hideaway Holdings for the 250 Property.

The purpose of the transaction described in the preceding paragraph was to facilitate the sale of the 250 Property, while obscuring the fact that petitioner was its true owner. On October 15, 2014, the 250 Property was sold to a third party for $276,472. At the closing, the title company issued to Currieco a check for $263,701, representing the sale proceeds less the costs of sale.

That same day Ms. Currie deposited the $263,701 check into an account at Oregon Pacific Bank (OPB account). She had opened this

[*7] account earlier in 2014 for the sole purpose of holding funds belonging to petitioner or to sham entities he controlled. In November 2015 Ms. Currie deposited another $7,622 into the OPB account, consisting of cash and checks payable to Olive Branch or Hideaway Holdings.

Ms. Currie testified that the funds in the OPB account belonged to Olive Branch and were not income to Currieco. Currieco did not include in its income, for tax or financial accounting purposes, any of the amounts that Ms. Currie deposited into the OPB account. During 2015, $20,000 was drawn from the OPB account to pay charges incurred on one of petitioner's Wells Fargo credit cards.

D. *IRS Examination*

Petitioner refused to cooperate with the revenue agent (RA) assigned to conduct the examination of his 2013–2016 tax years. The RA reconstructed petitioner's income on the basis of deposits made into the various accounts that petitioner controlled. The RA prepared for each year a substitute for return (SFR) that met the requirements of section 6020(b).

On October 24, 2018, the IRS issued petitioner a timely notice of deficiency for 2013–2016 determining the deficiencies and additions to tax set forth above. *See supra* p. 2. The underpayments of tax are attributable to the rents associated with the storage business, the rents associated with the cell phone tower, the sale of the 250 Property, and other income including cancellation-of-indebtedness income, patronage dividends, and taxable Social Security benefits. Petitioner timely petitioned this Court, advancing several frivolous and groundless arguments. He urged that the notice of deficiency was invalid because "it was not signed under penalties of perjury by [a] duly authorized assessment officer." And he urged that he is exempt from Federal income tax because he is "a citizen of the State of Oregon" and "not a federal citizen."

OPINION

The Commissioner's determinations in a notice of deficiency are generally presumed correct, and the taxpayer bears the burden of proving them erroneous. *See* Rule 142(a); *Welch v. Helvering*, 290 U.S. 111, 115 (1933). In certain circumstances section 7491 may shift the burden of proof to the Commissioner on certain factual issues. But that section applies only if the taxpayer (among other things) "introduces credible evidence" and "has maintained all records required under this title."

[*8] § 7491(a)(1), (2)(B).  Petitioner does not contend, and he could not plausibly contend, that he met these requirements.

I.    *Purported Trusts*

Taxpayers are generally free to structure their affairs to minimize taxes.  *Gregory v. Helvering*, 293 U.S. 465 (1935).  However, a trust is disregarded for tax purposes if in substance it lacks any valid purpose but is simply a tax-avoidance device.  *Zmuda v. Commissioner*, 79 T.C. 714, 719–20 (1982), *aff'd*, 731 F.2d 1417 (9th Cir. 1984); *Markosian v. Commissioner*, 73 T.C. 1235, 1244–45 (1980); *Nichols v. Commissioner*, T.C. Memo. 2003-24, 85 T.C.M. (CCH) 798, 800, *aff'd*, 79 F. App'x 282 (9th Cir. 2003).  Whether a trust lacks economic substance is a question of fact.  *Paulson v. Commissioner*, T.C. Memo. 1991-508, *aff'd*, 992 F.2d 789 (8th Cir. 1993).

As a threshold matter, petitioner did not meet his burden of proving that any of the purported trusts actually existed during 2013–2016. He produced no trust agreements, declarations of trust, trust income tax returns, or other evidence that would substantiate their existence.  Although he represented to Oregon authorities that he was a trustee of various trusts, he denied at trial that he ever served as a trustee.  Genuine trusts have trust documents that preclude this sort of uncertainty.

When asked about the ultimate beneficiaries of Emerald, Hideaway Holdings, and Olive Branch—which supposedly held, directly or indirectly, the storage business, the cell tower, and the 250 Property— petitioner, Ms. Currie, and Ms. Willardson all professed not to know.  It is inconceivable that the settlor, trustees, and managers of a genuine trust would be unable to identify its beneficiaries.  This evasive behavior strengthens our conclusion that these purported trusts were fictions.

Assuming arguendo that the trusts existed, we find that they lacked economic substance and were shams that must be ignored for Federal income tax purposes.  Currieco was a legitimate business entity. But we find that Ms. Currie connived with petitioner to make Currieco available to him as a conduit, through which cash could be diverted to him while concealing his ownership.  To the extent Currieco served as a mere conduit, we likewise ignore its existence for Federal income tax purposes.

Petitioner did not offer a shred of admissible evidence—only his self-serving and unsubstantiated testimony—that he lacked control over the income and assets in the accounts titled to the trusts and to Currieco

**[\*9]** (insofar as it served as a conduit for funneling money to him).  He routinely drew cash out of Hide Away's Umpqua account, Olive Branch's U.S. Bank account, Currieco's Umpqua account, Currieco's Rogue accounts, and Currieco's OPB account to pay his personal expenses.  These expenses included hundreds of items charged to his two Wells Fargo credit cards, a personal charge account at the Douglas County Farmers Co-op, a personal line of credit at WestAmerica Bank, and a vacation he took with Ms. Currie to a Mexican beach resort.  We find that the deposits made into all of the aforementioned accounts during 2013–2016 belong to petitioner.

II. *Unreported Income*

Section 61(a) provides that "gross income means all income from whatever source derived."  In cases of unreported income, the Commissioner must establish an evidentiary foundation connecting the taxpayer to the income-producing activity, *Weimerskirch v. Commissioner*, 596 F.2d 358, 361 (9th Cir. 1979), *rev'g* 67 T.C. 672 (1977), or demonstrate that the taxpayer actually received income, *Edwards v. Commissioner*, 680 F.2d 1268, 1270–71 (9th Cir. 1982).  Once the Commissioner has met his threshold burden, the burden shifts to the taxpayer to show that the Commissioner's determinations are arbitrary or erroneous.  *See Hardy v. Commissioner*, 181 F.3d 1002, 1004–05 (9th Cir. 1999), *aff'g* T.C. Memo. 1997-97.

Respondent has met his threshold burden here.  He has established petitioner's connection to the Hide Away storage business, the cell phone tower, and the 250 Property, and he has shown that petitioner regularly extracted funds from the accounts into which the rental income and sale proceeds were placed.  Respondent has also produced Forms 1099 establishing petitioner's connection to the "other income."  Petitioner did not assert "a reasonable dispute with respect to any item of income reported on" these Forms 1099.  *See* § 6201(d).  The burden thus shifts to petitioner to prove that the Commissioner's determinations of unreported income are arbitrary or erroneous.

A. *Rental Income*

A taxpayer must maintain books and records establishing the amount of his gross income.  *See* § 6001.  When a taxpayer does not keep accurate books and records, the Commissioner may reconstruct his income "under such method as, in the opinion of the Secretary, does clearly reflect income."  § 446(b); *see Petzoldt v. Commissioner*, 92 T.C. 661, 693

**[\*10]** (1989). Such reconstruction "need only be reasonable in light of all surrounding facts and circumstances." *Petzoldt*, 92 T.C. at 687. "When a taxpayer keeps no books or records, has large bank deposits, and offers no plausible explanation of such deposits, the Commissioner is not arbitrary or capricious in resorting to the bank deposit method for computing income." *Estate of Mason v. Commissioner*, 64 T.C. 651, 657 (1975), *aff'd*, 566 F.2d 2 (6th Cir. 1977); *see Gobins v. Commissioner*, 18 T.C. 1159, 1168 (1952), *aff'd per curiam*, 217 F.2d 952 (9th Cir. 1954).

Bank deposits are prima facie evidence of income. The bank deposits method starts with the presumption that all money deposited into a taxpayer's bank account during a given period constitutes taxable income. *Price v. United States*, 335 F.2d 671, 677 (5th Cir. 1964). This presumption is rebutted to the extent the deposits are shown to include nontaxable amounts, and "the Government must take into account any non-taxable source . . . of which it has knowledge." *Ibid.*; *DiLeo v. Commissioner*, 96 T.C. 858, 868 (1991), *aff'd*, 959 F.2d 16 (2d Cir. 1992). After the IRS reconstructs a taxpayer's income and determines a deficiency, the taxpayer bears the burden of proving that the IRS's implementation of the bank deposits method was unfair or inaccurate. *See Clayton v. Commissioner*, 102 T.C. 632, 645–46 (1994); *DiLeo*, 96 T.C. at 871–72.

Petitioner did not supply books and records or otherwise cooperate with the RA during the examination. The RA accordingly used the bank deposits method to reconstruct petitioner's income for 2013–2016. He began by analyzing account records for Hide Away's Umpqua account and the other accounts that petitioner controlled or to which he had access. These other accounts included the U.S. Bank accounts titled to Olive Branch and Emerald and the Umpqua, OPB, and Rogue accounts titled to Currieco.

The RA summonsed from these financial institutions monthly statements, copies of checks, and other documents, all of which are included in the record. He then tabulated the transfers made into these accounts that corresponded to the storage rental income and the cell tower rental income. In order to reflect more accurately the credit card proceeds from Hide Away's rental business, the RA used the amounts appearing on the Forms 1099–K supplied by CTS.

After eliminating nontaxable receipts of which he was aware, the RA concluded that petitioner received, during 2013–2016, $459,785 of rents reportable on Schedule E, Supplemental Income and Loss. These

[*11] amounts constitute the bulk of the ordinary income the RA identified as petitioner's unreported income for these years. Petitioner did not challenge, during the examination or at trial, the RA's use of the bank deposits method or the amounts the RA determined to constitute taxable income.

Once the IRS reconstructs a taxpayer's income and determines a deficiency, the taxpayer bears the burden of proving that the IRS's implementation of the bank deposits method was unfair or inaccurate. *See Ruark v. Commissioner*, 449 F.2d 311, 312 (9th Cir. 1971), *aff'g per curiam*, T.C. Memo. 1969-48; *Clayton*, 102 T.C. at 645–46; *DiLeo*, 96 T.C. at 871–72. Petitioner wholly failed to meet his burden of proof; indeed, he did not even try, apart from arguing that he was altogether exempt from Federal income tax. We accordingly find that the Commissioner's bank deposits analysis, as applied to determine petitioner's Schedule E rental income, has not been shown to be "arbitrary or erroneous." *Hardy v. Commissioner*, 181 F.3d at 1004.

### B. *Capital Gain*

Gross income includes gains from dealings in property. § 61(a)(3). A taxpayer must recognize gain on the sale of property in an amount equal to the difference between the amount realized and his cost or adjusted basis. §§ 1001, 1012; *Hacker v. Commissioner*, T.C. Memo. 2022-16, 123 T.C.M. (CCH) 1088, 1098. The taxpayer bears the burden of establishing his basis (if any) in the property. *O'Neill v. Commissioner*, 271 F.2d 44, 50 (9th Cir. 1959), *aff'g* T.C. Memo. 1957-193.

The IRS determined in the notice of deficiency that petitioner for 2014 had net taxable capital gain of $263,701 realized upon sale of the 250 Property. Petitioner does not dispute that the net proceeds from this sale were $263,701. But he contends that these proceeds did not belong to him.

We reject that contention. The 250 Property was initially owned (in a nominal sense) by Hideaway Holdings, a "trust" that did not exist (or was a sham). Petitioner was the true owner of the 250 Property when it was conveyed (for no consideration) to Currieco in 2014. Ms. Currie deposited the proceeds from the sale of the 250 Property into the OPB account. This account was accessible to petitioner, as evidenced by his use of funds in that account to pay his Wells Fargo credit card bills.

Ms. Currie admitted at trial that the funds in the OPB account did not belong to Currieco, and Currieco did not report the $263,701 as

**[\*12]** its income. To the contrary, she testified that the funds in the OPB account belonged to Olive Branch, one of petitioner's "trusts." We find that petitioner owned the 250 Property and that the gain on its sale was taxable to him.

It was petitioner's burden to establish his cost or adjusted basis in the 250 Property. *See O'Neill v. Commissioner*, 271 F.2d at 50. If he had a basis that could be offset against the sale proceeds, he failed to supply any evidence of that basis to the IRS or to the Court. Respondent has conceded that petitioner's gain on this sale is taxable as long-term capital gain, rather than short-term gain as determined in the notice of deficiency. *See* § 1222(1), (3). We thus find that petitioner is taxable for 2014 on long-term capital gain of $263,701.[2]

C.      *"Other Income"*

1.      *Cancellation of Indebtedness*

The IRS determined in the notice of deficiency that petitioner for 2013 received $73,906 of cancellation-of-indebtedness (COI) income. Gross income generally includes income from the discharge of indebtedness. § 61(a)(12). The rationale of this principle is that the cancellation of indebtedness provides the debtor with an economic benefit that is equivalent to income. *See United States v. Kirby Lumber Co.*, 284 U.S. 1 (1931); *Friedman v. Commissioner*, 216 F.3d 537, 545 (6th Cir. 2000), *aff'g* T.C. Memo. 1998-196.

The year for which a taxpayer realizes COI income is a question of fact to be determined on the basis of the evidence. *See Policy Holders Agency, Inc. v. Commissioner*, 41 T.C. 44, 47 (1963); *Newman v. Commissioner*, T.C. Memo. 2016-125, 111 T.C.M. (CCH) 1599, 1600. A debt is deemed discharged the moment it becomes clear that the debt will never be repaid. *Cozzi v. Commissioner*, 88 T.C. 435, 445 (1987). "Any 'identifiable event' which fixes the loss with certainty may be taken into consideration." *Id.* (citing *United States v. S.S. White Dental Mfg. Co.*, 274 U.S. 398 (1927)); *see also* Treas. Reg. § 1.6050P-1(b)(2)(i). A creditor's issuance of a Form 1099–C, Cancellation of Debt, is an identifiable

---

[2] On October 13, 2022, four months after the trial, respondent filed a Motion to amend his Answer to assert additional capital gain on the sale of other properties on Grant Smith Road allegedly belonging to petitioner. We denied that Motion, concluding that petitioner would be prejudiced by allowing that amendment at the post-trial stage of the case.

[*13] event that is evidence of the creditor's intention to cancel the debt. *Newman*, 111 T.C.M. (CCH) at 1600; Treas. Reg. § 1.6050P-1(b)(2)(i)(G).

For 2013 petitioner received Forms 1099–C from U.S. Bank and Capital One Bank reporting COI income totaling $29,546. The Form 1099–C issued by U.S. Bank reported COI income of $22,208, relating to an account titled to "Emerald Investment Co., Lawrence J. Saccato." The Form 1099–C issued by Capital One Bank reported COI income of $7,338, relating to an account titled to "Larry Saccato, Hideaway Holdings."

Petitioner introduced no evidence to contradict the information appearing on these two Forms 1099–C. Indeed, he introduced no evidence on this subject at all.[3] We accordingly find that $29,546, the sum of the amounts appearing on these Forms 1099–C, is taxable to petitioner as COI income for 2013. On brief respondent conceded $44,360, the balance of the COI income determined in the notice of deficiency for 2013. We accordingly hold that petitioner is not taxable on the latter sum.

### 2. *Patronage Dividends*

The IRS determined in the notice of deficiency that for 2013–2016 petitioner received but did not report patronage dividends of $56, $11, $16, and $16, respectively. These amounts appear on Forms 1099–PATR, Taxable Distributions Received From Cooperatives, issued to petitioner by the Douglas County Farmer's Co-op.

"Patronage dividends" are includable in gross income unless an exception applies. § 1385(a); *Ag Processing, Inc. v. Commissioner*, 153 T.C. 34, 46 (2019). Petitioner conceded at trial that he received these amounts but offered frivolous arguments in contending that they are excludable from his gross income. We hold that the patronage dividends are taxable to him as determined in the notice of deficiency.

### D. *Social Security Benefits*

The Internal Revenue Code provides that up to 85% of a taxpayer's Social Security benefits are includable in gross income if his

---

[3] At the beginning of trial petitioner urged that he was not taxable on the amount reported by U.S. Bank, vaguely suggesting that "an insurance company" had paid off the U.S. Bank debt. But he never followed up on this suggestion and presented no evidence tending to show that respondent's determination was incorrect.

**[*14]** "modified adjusted gross income" exceeds specified thresholds. *See* § 86(a) and (b); *Brady v. Commissioner*, T.C. Memo. 2013-1, 105 T.C.M. (CCH) 1001, 1002. The IRS determined in the notice of deficiency that petitioner received $3,697 of Social Security benefits in 2016 and that 85% of that total, or $3,142, was includable in his gross income under section 86(a)(2)(B). At trial petitioner conceded that he received $3,697 of Social Security benefits, and he did not dispute respondent's calculation of the taxable portion. We accordingly sustain inclusion of $3,142 of taxable Social Security benefits in his gross income for 2016.

III.  *Additions to Tax*

A.  *Failure to File*

Section 6651(a)(1) provides for an addition to tax of 5% of the tax required to be shown on a return for each month (or a fraction thereof) for which there is a failure to file the return, not to exceed 25% in toto. Respondent has the burden of production on this issue. *See* § 7491(c). Respondent has produced Forms 4340, Certificate of Assessments, Payments, and Other Specified Matters, which show that petitioner did not file returns for 2013–2016. These were sufficient to satisfy respondent's burden of production. *See Murray v. Commissioner*, T.C. Memo. 2017-67, 113 T.C.M. (CCH) 1314, 1317.

Petitioner has supplied no evidence that he filed Federal income tax returns for 2013–2016. Indeed, by asserting frivolous arguments in support of his assertion that he had no obligation to file such returns, he has effectively admitted that he did not file them. He has alleged no facts and produced no evidence showing that his failures were "due to reasonable cause and not due to willful neglect." *See* § 6651(a)(1). We will accordingly sustain the failure-to-file additions to tax for 2013–2016.

B.  *Failure to Pay*

Section 6651(a)(2) provides for an addition to tax when a taxpayer fails to pay timely the tax shown on a return unless the taxpayer proves that his failure was due to reasonable cause and not due to willful neglect. An SFR prepared by the IRS pursuant to section 6020(b) is treated as the "return" filed by the taxpayer for purposes of section 6651(a)(2). *See* § 6651(g). To meet his burden of production under section 7491(c) for this addition to tax, respondent must produce evidence of a tax return, which can take the form of an SFR. *Wheeler v. Commissioner*, 127 T.C. 200, 208–10 (2006), *aff'd*, 521 F.3d 1289 (10th Cir. 2008).

**[\*15]** Respondent met his burden of production by introducing into evidence certified copies of the SFRs that the IRS prepared on petitioner's behalf for 2013–2016. These SFRs met the requirements of section 6020 and thus constituted valid tax returns. Petitioner has not paid the tax shown on those returns and has not shown that his failures were "due to reasonable cause and not due to willful neglect." *See* § 6651(a)(2). Quite the contrary: Petitioner urged as his justification for failing to file that he "was not a federal citizen" and was thus immune from Federal income tax. We will accordingly sustain the failure-to-pay additions to tax for 2013–2016.

C.    *Failure to Make Estimated Tax Payments*

Section 6654(a) imposes an addition to tax on an individual who underpays his estimated tax. This addition to tax is calculated with reference to four required installment payments of the taxpayer's estimated tax liability. § 6654(c) and (d). Each required installment is equal to 25% of the "required annual payment." § 6654(d). Where a taxpayer has not filed a return for the current tax year or the immediately preceding tax year, the "required annual payment" is equal to 90% of the tax due for the current year. § 6654(d)(1)(B).

Respondent's burden of production under section 7491(c) requires him to produce, for each year for which the addition to tax is asserted, evidence that the taxpayer had a "required annual payment" under section 6654(d). To do so, respondent must establish the tax shown on the taxpayer's return for the preceding year or demonstrate that the taxpayer filed no such return. *See Wheeler*, 127 T.C. at 212; *Collins v. Commissioner*, T.C. Memo. 2020-50, 119 T.C.M. (CCH) 1319, 1330.

Respondent met his burden of production by producing Forms 4340 showing that petitioner did not file income tax returns for 2012–2016. *See Murray*, 113 T.C.M. (CCH) at 1317. Petitioner's "required annual payment" for 2013–2016 thus equaled 90% of the tax due for each of those years. *See* § 6654(a), (d)(1)(B). Petitioner has not alleged (and has adduced no facts indicating) that he made any estimated tax payments for 2013–2016. We will accordingly sustain the additions to tax under section 6654(a).

IV.    *Penalty for Maintaining Frivolous Positions*

Section 6673(a)(1) authorizes this Court to require a taxpayer to pay to the United States a penalty, not in excess of $25,000, "[w]henever it appears to the Tax Court that—(A) proceedings before it have been

**[\*16]** instituted or maintained . . . primarily for delay, [or] (B) the taxpayer's position in such proceeding is frivolous or groundless." The purpose of section 6673 is to compel taxpayers to conform their conduct to settled tax principles and to deter the waste of judicial and IRS resources. *Coleman v. Commissioner*, 791 F.2d 68, 71–72 (7th Cir. 1986); *Salzer v. Commissioner*, T.C. Memo. 2014-188, 108 T.C.M. (CCH) 284, 287. "Frivolous and groundless claims divert the Court's time, energy, and resources away from more serious claims and increase the needless cost imposed on other litigants . . . ." *Kernan v. Commissioner*, T.C. Memo. 2014-228, 108 T.C.M. (CCH) 503, 512, *aff'd*, 670 F. App'x 944 (9th Cir. 2016).

Petitioner began advancing frivolous arguments at the commencement of this case, and he has not stopped since, despite our warnings that he should desist. He asserted in his Petition that he is exempt from Federal income tax because he is "a citizen of the State of Oregon" and "not a federal citizen." And he urged that the notice of deficiency was invalid because "it was not signed under penalties of perjury by duly authorized assessment officer." A notice of deficiency is not required to be signed "under penalties of perjury." And given the restrictions against assessment set forth in section 6213, a notice of deficiency is not required to be signed by "a duly authorized assessment officer." All of these arguments have been identified by the Commissioner as frivolous. *See Wnuck v. Commissioner*, 136 T.C. 498 (2011); *Aldrich v. Commissioner*, T.C. Memo. 2013-201, 106 T.C.M. (CCH) 192 (citing *Crain v. Commissioner*, 737 F.2d 1417, 1417 (5th Cir. 1984)).

Although the liabilities determined in the notice of deficiency exceed $50,000 for both 2013 and 2014, petitioner filed his case as a "small tax case," a procedure available only when the amount in dispute does not exceed $50,000. *See* § 7463(a), (e). In numerous filings he defended that position on the theory that, as "a citizen of Oregon," he had zero Federal tax liability for either year. By Order served May 8, 2019, we struck the "S" designation and directed that the case proceed under the Court's regular deficiency procedures.

Four months after filing his Petition, petitioner moved to have this case dismissed for lack of jurisdiction, setting forth a plethora of arguments pulled off tax-protester websites. He asserted (among other things) that the IRS "lacks personam jurisdiction over Lawrence James Saccato, who is an American, Citizen of Oregon (expressly not a federal citizen and not resident alien)." And he asserted that the IRS "failed to

**[\*17]** execute the required procedurally proper Assessment Certificate(s) which corresponds to each Notice of Deficiency."

In our May 8, 2019, Order, we denied petitioner's Motion to Dismiss. He immediately moved to vacate our Order, asserting that the deficiency notices were invalid and that the Court must take "Mandatory Judicial Notice" of the Internal Revenue Code. We denied that Motion, but he persisted in arguing that we lacked jurisdiction, contending in an August 2020 Motion for Continuance that he is neither a "federal citizen nor a resident alien."

In an Order served February 4, 2021, we warned petitioner that he risked a sizable penalty if he hewed to the course he was then pursuing:

> I.R.C. § 6673(a)(1) authorizes this Court to require a taxpayer to pay to the United States a penalty of up to $25,000 if it appears to the Court that the taxpayer has instituted or maintained proceedings "primarily for delay" or has taken a position that "is frivolous or groundless." Petitioner's submissions to this Court to date have included numerous frivolous statements and positions. We warn petitioner that he risks a significant penalty if he continues on this path. *See, e.g., Briggs v. Commissioner*, T.C. Memo. 2016-86 (imposing penalty of $3,000); *Balice v.Commissioner*, T.C. Memo. 2015-46 (imposing penalty of $25,000).

Despite that warning, petitioner advanced more frivolous arguments in a document filed July 26, 2021 (docket entry #33). We issued another warning three weeks later (docket entry #34). Still undeterred, he filed a Summary Judgment Motion on October 4, 2021, stating: "Petitioner has noticed [*sic*] the Respondent as far back as 2005 of Petitioner's standing of his being an *Oregon State Citizen* and specifically NOT a *Federal Citizen* or a *Resident Alien*. At no time since 2005, after Petitioner has noticed [*sic*] each and every subsequent Commissioner and other high ranking officials, there has not been a rebuttal of Petitioner's standing."

At the outset of trial we again warned petitioner to refrain from making frivolous arguments. He again ignored our warning, filling his post-trial brief with gibberish commonly embraced by tax protesters—e.g., that he "never knowingly elected to be treated as a 'taxpayer'," that he "was protected through the doctrine of estoppel," and that "the notice

**[\*18]** of deficiency lacked the required jurat signed under the penalties of perjury."

Although petitioner maintains that "[he] is not a tax protestor," his filings in this Court belie that contention. His persistent filing of frivolous papers has wasted the Government's time and ours. We will accordingly require that he pay to the United States a penalty of $10,000.

To implement the foregoing,

*Decision will be entered under Rule 155.*